UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KRISTAL MADRID, individually, and as successor-in-interest to PEDRO MADRID,<br><br>        Plaintiffs,<br><br>v.<br><br>CITY OF FRESNO, a municipal corporation; JERRY DYER, in his capacity as Chief of Police for the CITY OF FRESNO; JUAN GURROLA, individually and in his official capacity as a police officer for the CITY OF FRESNO; JUSTIN BELL, individually and in his official capacity as a police officer for the CITY OF FRESNO; MONTY LEWIS JR., individually and in his official capacity as a police officer for the CITY OF FRESNO; GEORGE VALDEZ, individually and in his official capacity as a police officer for the CITY OF FRESNO; FRANK MENDOZA, individually and in his official capacity as a police officer for the CITY OF FRESNO; DOES 6-100, individually and in their official capacities as a police officer for the CITY OF FRESNO.<br><br>        Defendants. | 1:08-cv-00098 OWW SMS<br><br>MEMORANDUM DECISION RE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND/OR ADJUDICATION OF THE ISSUES, DEFENDANTS' OBJECTIONS AND MOTION TO STRIKE<br><br>(DOCS. 46, 65) |

I. INTRODUCTION

Plaintiff Kristal Madrid ("Plaintiff") proceeds with this

action against Defendants City of Fresno ("Defendant City"),

1

Jerry Dyer, Juan Gurrola, Justin Bell, Monty Lewis, Jr., George Valdez, and Frank Mendoza (collectively, "Defendants"), alleging claims for (1) civil rights violations pursuant to 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments of the Constitution; (2) assault and battery; (3) violation of California Civil Code § 51.7 (Unruh Civil Rights Act); (4) violation of California Civil Code § 52.1 (Bane Civil Rights Act); (5) negligence – wrongful death; and (6) negligent hiring, retention, training, supervision, and discipline.

Before the court is Defendants' motion for summary judgment and/or adjudication of the issues. Doc. 46. Plaintiff filed an opposition on January 24, 2011 (Doc. 58), and supporting declarations and exhibits on January 25, 2011, one day late (Docs. 60-61). Defendants filed a reply (Doc. 66) and an objection and motion to strike (Doc. 65). Plaintiff filed an opposition to Defendant's objection and motion to strike. Doc. 67.

## II. FACTUAL BACKGROUND

### A. Undisputed Facts

On the night of January 8, 2007, CHP Officers Dusten Dimmer and Derek Saladana encountered Pedro Madrid walking northbound on the center divider of Freeway 41 in Fresno, California. Mr. Madrid was unarmed and wearing a sleeveless shirt without a jacket. When asked what he was doing walking on the freeway, Mr.

Madrid replied that he was running from someone. Officer Dimmer did not observe that Mr. Madrid was intoxicated, and did not recall if Mr. Madrid was sweating or otherwise exhibited signs that indicated that Mr. Madrid was under the influence of a narcotic such as methamphetamine. Officers Dimmer and Saladana concluded that further detention of Mr. Madrid was not necessary, and transported him to the Fresno Rescue Mission.

At approximately 12:20 a.m., Sergeant Michael Maguire was driving down Kern Street near E Street over Freeway 99 in Fresno, California, and saw Mr. Madrid walking down the middle of the street. Sergeant Maguire declares that Mr. Madrid was walking and moving in an unusual manner, flailing his arms around. Sergeant Maguire activated his spotlight and shined it in Mr. Madrid's direction. Mr. Madrid fled down the embankment of Freeway 99. Sergeant Maguire turned off his lights, waited for Mr. Madrid to return to no avail, then drove to the police station.

At approximately 12:33 a.m., Officer Ronnie Pack noticed Mr. Madrid walking barefoot in the middle of the street, holding his shoes, and yelling at someone, although no one else was present. In response to Officer Pack's queries, Mr. Madrid said that someone was trying to get him and he was yelling at that person. Mr. Madrid complied with Officer Pack's request to step out of the roadside and to submit to a pat down (the pat down did not yield any weapons). Mr. Madrid also complied with Officer Pack's

request to sit on the curb while Officer Pack ran a "wants and warrants" check on Mr. Madrid over police radio. Shortly thereafter, Sergeant Maguire asked for the subject's physical description, and reported over the police radio that the subject matched the description of a person who had run from Sergeant Maguire earlier that evening.

Officer Pack observed that Mr. Madrid appeared to be fidgety and unable to stay still. In response to Officer Pack's questioning, Mr. Madrid told Officer Pack that he had snorted meth, which Officer Pack understood to mean methamphetamine, 1 ½ hours before his encounter with Officer Pack. Under City of Fresno policies, officers who encounter persons who appear to be under the influence of drugs/narcotics must detain such persons and conduct an investigation. After conducting a physical examination of Mr. Madrid (including observing Mr. Madrid's dilated pupils and elevated heart rate), Officer Pack believed Mr. Madrid was under the influence of methamphetamine in violation of Health and Safety Code § 11550.

Officer Pack observed that Mr. Madrid appeared anxious at the prospect of going to jail. Officer Pack attempted to calm Mr. Madrid by explaining that he only planned to issue a citation to him. Officer Pack was then advised over the radio that Mr. Madrid was on felony probation for narcotics violations.

Based on Officer Pack's evaluation of Mr. Madrid and what he

had observed or had been reported to him, Officer Pack believed that he had probable cause to arrest Mr. Madrid for being under the influence of a controlled substance and for violation of probation. Officer Pack decided to arrest Mr. Madrid. Another patrol car with Officers David Lambert and Michael Hansen pulled up behind Officer Pack.

As Officer Pack touched Mr. Madrid's right wrist, Mr. Madrid stood up and started running away westbound on Kern Street. Officer Pack ran after Mr. Madrid, yelling at him several times that he was under arrest and to stop. Officer Pack reported Mr. Madrid's flight (a leg-bail) over the police radio, briefly describing Mr. Madrid's physical appearance and location. Officer Pack told Mr. Madrid several times to stop running, but Mr. Madrid did not comply with Officer Pack's verbal orders.

Officer Pack continued chasing Mr. Madrid on foot westbound on Kern Street as he observed Mr. Madrid climb over a fence on the south side of Kern Street leading to Freeway 99. Officer Lambert also pursued Mr. Madrid on foot while Officer Hansen followed in the patrol car. Mr. Madrid ran down the freeway embankment. Officer Pack told him to stop and pointed, but did not deploy, his TASER X-26 Electronic Control Device ("TASER") at Mr. Madrid.

Mr. Madrid turned around on the embankment and faced Officer Pack as if he was going to come back on the embankment and

5

surrender. Mr. Madrid turned around and ran down the embankment and underneath the Kern Street overpass on Freeway 99. Officer Pack saw other police officers take Mr. Madrid into custody on the west side of the freeway, and heard someone yelling, "Stop resisting." Defendant Bell arrived at the location and went down the embankment to assist the officers.

Responding to Officer Pack's reports, Defendants Lewis and Gurrola arrived at Mr. Madrid's reported location and positioned their patrol car on the west end of Freeway 99 on the Kern Street overpass. Defendant Gurrola saw other police officers on the east end of the overpass and heard a radio call that Mr. Madrid was on the east embankment. Defendant Gurrola did not see Mr. Madrid at first, then heard a radio call that Mr. Madrid was heading westbound, down the embankment, across the northbound lanes of Freeway 99. Defendant Gurrola jumped the fence on the west side of Freeway 99 and saw Mr. Madrid on Freeway 99 attempting to go over the raised concrete center divider below. Mr. Madrid was headed westbound across Freeway 99. There was moderate traffic in both the northbound and southbound lanes of Freeway 99. Defendants Gurrola, Lewis, and Bell came down the embankment to intercept Mr. Madrid.

As Defendant Gurrola reached the bottom of the embankment, he saw Mr. Madrid in the middle of Freeway 99 near the center divider. Defendant Gurrola repeatedly said, "Stop, police," but

Mr. Madrid continued fleeing in a southwest direction down the middle of three southbound lanes on Freeway 99. Defendant Gurrola crossed in an eastbound direction on the southbound lanes of Freeway 99 toward the concrete divider and tried to intercept Mr. Madrid. Defendant Gurrola kept telling Decedent to stop. Defendant Gurrola identified himself as a police officer and was dressed in full uniform with a badge and two Fresno Police Department patches.

Defendant Gurrola attempted to grab Mr. Madrid from behind, but Mr. Madrid pushed away. Defendant Gurrola removed his TASER with his left hand as he continued trying to grab Mr. Madrid with his right hand. Defendant Gurrola did not use the TASER on Mr. Madrid because he was concerned Mr. Madrid would fall to the ground and get run over by passing traffic. Mr. Madrid continued to push Defendant Gurrola's arms away as he continued running.

Defendant Lewis caught up to Defendant Gurrola and Mr. Madrid in the middle of a southbound lane on Freeway 99. Traffic was approaching on Freeway 99. Defendant Lewis grabbed Mr. Madrid from the No. 2 lane at approximately the same time that Defendant Gurrola made contact with him. Defendant Lewis pulled Mr. Madrid in a westbound direction towards Freeway 99's west embankment and away from oncoming traffic.

Defendant Gurrola and Mr. Madrid were face to face as they lost their balance and fell to the ground at the west edge of the

shoulder to the freeway. Upon hitting the ground, Mr. Madrid continued actively resisting the officers' attempts to restrain him. Defendant Gurrola attempted to position himself on top of Mr. Madrid, but Defendant Gurrola ended up with his legs facing south to the left side of Mr. Madrid, his torso over Mr. Madrid's torso and his chest on Mr. Madrid's back-left shoulder area. Defendant Gurrola pushed Mr. Madrid down to restrain his movements. Mr. Madrid thrashed and kicked his legs, moved and flailed his arms, and moved his torso up and down off the ground from side to side. Mr. Madrid pulled his arms underneath his chest as he faced downward. Defendant Gurrola told Mr. Madrid several times to stop resisting while trying to get Mr. Madrid's hands from underneath his body.

Defendant Lewis was kneeled or crouched on the ground to the right of Mr. Madrid. Defendant told Mr. Madrid to put his hands behind his back. Defendant Lewis tried to get control of Mr. Madrid's right hand to bring it out for handcuffing by pulling near Mr. Madrid's bicep and forearm area. Defendant Lewis could not pull Mr. Madrid's arm out. Mr. Madrid continually kept his arms underneath his body, putting his hands forward underneath his chest and leaning in a forward motion.

Defendant Valdez arrived and took a position on the right side of Mr. Madrid and Defendant Lewis. Defendants Valdez and Lewis were unable to pull Mr. Madrid's right arm from underneath

his chest. Defendant Gurrola was near Mr. Madrid's upper left back-shoulder area and told Mr. Madrid to stop resisting. Defendant Lewis was near Mr. Madrid's waist trying to grab Mr. Madrid's right arm from under his body. Defendant Valdez slipped in between both officers and was shoulder to shoulder with Defendant Lewis, with Defendant Valdez's knees next to Mr. Madrid on his right side.

Defendant Gurrola attempted to place a carotid hold on Mr. Madrid with his right arm over the top of Mr. Madrid's shoulder, but was unsuccessful because Mr. Madrid was moving so forcefully. Defendant Gurrola repositioned his left arm on Mr. Madrid's upper back, across his shoulder area, and near his neck using an arm bar to the upper shoulder area to attempt to prevent Mr. Madrid from moving. Defendant Lewis told Defendant Gurrola that he was going to apply the TASER to Mr. Madrid and that Defendant Gurrola should move away. Defendant Gurrola continued to hold Mr. Madrid's torso near the collarbone.

Mr. Madrid's head was pointing west and turned sideways, with his left cheek repeatedly rising off the ground until the officers' efforts caused him to go back down. Mr. Madrid tried to push his body up off the ground about 3-4 times over about 5-10 seconds. Defendant Lewis used his hand to push down on Mr. Madrid's back.

Approximately 10-15 seconds after Defendant Valdez arrived,

Defendant Lewis knelt beside Mr. Madrid's left side. Defendant Lewis removed his department-issued TASER, discarded the cartridge that contained probe darts and applied the TASER in a contact or drive stun mode two to four times to the exposed upper right side of Mr. Madrid's back. On each occasion Defendant Lewis pulled the TASER off before it completed the device's five second cycle.

Defendant Lewis pushed his 12-15" long, 1" wide Ultra Singer flashlight into Mr. Madrid's back near his kidney, the same area he had applied the TASER, 2 to 3 times. Defendant Lewis then placed his knee on the ground and struck Mr. Madrid with the flashlight in a downward motion 3 to 4 times in the same general area. Defendant Lewis then applied a single blow to Mr. Madrid with a closed fist on the right cheek of his face. Mr. Madrid did not release his hands. Defendant Lewis activated the TASER on Mr. Madrid again. At one point during the TASER's activation, Defendants Lewis and Valdez were accidentally tased and Defendant Gurrola felt the electric current pass through Mr. Madrid and to him.

Defendant Gurrola was facing downward with Mr. Madrid on the ground when Defendant Mendoza and Officer Alvarado arrived. After approximately another 30-45 seconds of struggling, Defendant Mendoza pulled Mr. Madrid's arms from underneath him. Handcuffs were applied to Mr. Madrid, during which time Defendant Gurrola

heard Mr. Madrid say, "Kill me, kill me."

Mr. Madrid was still moving around and kicking after his hands were handcuffed. Mr. Madrid's thighs came off the ground. Defendant Bell placed his knee on Mr. Madrid's legs near the calves, and Defendant Bell's hands braced on Mr. Madrid's legs. In response, Defendant Valdez applied his shin as a wedge against the right side of Mr. Madrid's lower back area, over the top of his waist at about a 45-degree angle. Defendant Mendoza employed a similar wedge position against the upper-mid back of Mr. Madrid, with his shin at a 45-degree angle relative to the ground and his knee over the approximate center of the left side of Mr. Madrid's back in a similar crouch position. Sergeant DeJong saw a crouching officer place his knee on Mr. Madrid's torso for about 10-15 seconds until Defendant Bell applied a hobble restraint on Mr. Madrid's legs. The hobble was too tight, and was reapplied. After the hobble was connected to the handcuffs, the officers stood up.

Defendants Valdez and Mendoza rolled Mr. Madrid to the side and noticed that his face was pale or bluish in color. Officer Alvardado retrieved a red medical box from a police unit and Officer Bailey began CPR. Officer Alvarado applied the air bag to Mr. Madrid. Fire personnel arrived on the scene and took over the CPR. Defendant Lewis advised Sergeant DeJong that he had applied the TASER in contact/drive-stun mode on Mr. Madrid. An ambulance

was called to treat Mr. Madrid for the TASER applications, as per standard procedure.

Mr. Madrid was pronounced dead on January 12, 2007.

The Fresno County Coroner's Report made the following findings:

    I.   Blunt impact to the head with
         a. Abrasions to the left side of the forehead.
         b. Abrasions to the left upper eyelid.
    II.  Blunt impact to the trunk with
         a. Three pairs of patterned abrasions to the right side
            front of chest as well as to the right side of the
            back.
         b. Multiple abrasions to the back.
    III. Blunt impact to the extremities with
         a. Multiple abrasions to the back of the left elbow and
            left wrist.
         b. Abrasions to the back of the right elbow.
         c. Multiple abrasions on the outer aspect of the right
            knee as well as the front of the left knee.
         d. Multiple abrasions to the front of the right leg.
            All the abrasions show partial healing.

Doc. 61, Ex. W, 8. The coroner opined that the cause of death is "pulmonary arrest during restraint in a person under the influence of Methamphetamine" and determined that "[a]sphyxia being a contributing mechanism cannot be ruled out." Doc. 61, Ex. W, 8-9.

According to the coroner's report, Mr. Madrid was 5'7" tall and weighed 184 pounds. On the date of the incident, Defendant Bell was 5'11" tall and weighed approximately 235 pounds; Defendant Gurrola was 5'6" tall and weighed approximately 165 pounds; Defendant Lewis was 5'8" tall and weighed approximately 170 pounds; Defendant Valdez was 5'7" tall and weighed approximately 160 pounds; and Defendant Mendoza was 5'7" tall and

12

weighed approximately 175 pounds.

Sergeant Dejong initiated a use of force investigation with Sergeant Maguire. Sergeant Maguire questioned the officers about the incident. Sergeant Maguire did not personally observe any part of the struggle between Defendants Gurrola, Bell, Lewis, Valdez, and Mendoza (collectively, "Officer Defendants") and Mr. Madrid.

The City of Fresno Police Department has policies and procedures regarding: 1) use of force regarding TASERs; 2) issued and optional equipment; 3) subjects under the influence of drugs; 4) restraint procedures; 5) handling and evaluation of mentally ill persons; 6) training regarding positional asphyxia and the handling of § 5150 subjects; and 7) training regarding the reasonable use of force regarding electronic weapons such as a TASER. Officer Defendants all received training in accordance with Fresno Police Department policies.

The City of Fresno Police Department's Roll Call Training Bulletin on Positional Asphyxia provides in pertinent part:

> Positional asphyxia usually occurs during arrest situations where a violent often times combative subject is taken into custody. Due to their violent nature, most subjects arrested during these encounters are placed on their stomachs, to reduce their ability to kick and injure officers, and to facilitate handcuffing. After handcuffing, the subjects [sic] handcuffs are then attached to a hobble which has been placed around the subjects [sic] ankles.

> Asphyxia occurs when the body's heart-rate and breathing become rapid due to the struggle. The subject is placed on their stomach, and the stretching of the subjects [sic] mid-section due to the hobble, restricts their ability to breath [sic]. Positional Asphyxia is not new. It can occur at any

time and some people are predisposed to this condition. Several factors to be aware of are:

> (a) Obesity;
> (b) Drugs and/or alcohol intoxication;
> (c) Violent struggle extreme enough to require officers to employer a hobble; and
> (d) Unresponsiveness of subject during or immediately after struggle.

Several cases have been documented where subjects have died due to positional asphyxia. During the resulting autopsy, the subjects were found to have drugs in their system, however the levels were not toxic and drug intoxication was ruled out as a cause of death. . . .

As soon as the subject is handcuffed, get him/her off their stomach.

In conclusion, officers who arrest a violent, combative person must protect themselves from further attack or possible injury. Using a hobble to restrain a subject's legs can cause an unintended physical reaction.

Doc. 46, Ex. H, 3.

**B. Disputed Facts**

Defendants contend that during Officer Pack's encounter with Mr. Madrid, he suspected Mr. Madrid was under the influence of a controlled substance and/or possibly mentally ill. Defendants also contend that during the incident, Defendant Lewis suspected Mr. Madrid was under the influence of PCP or other controlled substance.

Defendants contend that during the incident, Defendant Bell feared Mr. Madrid might be hiding a weapon or firearm underneath his person; Defendant Gurrola feared Mr. Madrid might have a weapon in the front of his waistband or underneath his torso; Defendant Lewis feared Mr. Madrid was attempting to conceal a

**14**

knife, rock, or other kind of weapon under his torso; Defendant Gurrola was afraid that Mr. Madrid had a firearm or knife underneath his person; and Defendant Bell feared that Mr. Madrid might be concealing a weapon.

Defendants contend that during the incident Defendant Officers were concerned that their position during the struggle placed them in danger of being hit by vehicles traveling south on Freeway 99.

After Defendant Gurrola was unsuccessful in placing a carotid hold on Mr. Madrid, Defendants contend that Defendant Gurrola was unable to apply any pressure on Mr. Madrid's neck. Pointing to Defendant Gurrola's police interview, Plaintiff contends that Defendant Gurrola's forearm was around Mr. Madrid's throat for a few seconds, then slipped down from Mr. Madrid's chin to his chest area, where it remained until Mr. Madrid was handcuffed and hobbled. Doc. 61, Ex. O, 3-5.

Defendants contend that no officer's body weight would have prevented Mr. Madrid from pulling his arm out from underneath his body. Plaintiff contends that the weight of the officers on top of Mr. Madrid prevented him from pulling his arms from underneath him to comply with Officer Defendants' requests. In his police deposition, Defendant Gurrola states that his arm was under Mr. Madrid's body and he could not remove it due to the weight of the officers on top of him. Doc. 61, Ex. H, 36.

15

Defendants contend that during the incident Mr. Madrid continued to struggle against the officers by locking his hands underneath his torso, refusing to obey commands to put his arms behind his back, flailing his body from side to side and up and down in push-up like movements, and lifting his upper body completely away from the ground, as if he was trying to get up and get away. Plaintiff contends that Mr. Madrid's movements were the reaction of a person trying to breathe under the weight of the officers.

Defendants contend that the TASER did not evoke any compliance response from Mr. Madrid. Defendants contend that after Defendant Lewis applied the TASER two to four times on Mr. Madrid, Defendant Lewis ordered Mr. Madrid to put his hands behind his back, but he did not comply. Mr. Madrid continued to flail, press his body off the ground as though he was doing push-ups, twist, and forcefully move to evade their restraint.

Defendants contend that after Mr. Madrid was handcuffed, Defendant Gurrola did not have any further physical contact with Mr. Madrid. Pointing to Defendant Gurrola's deposition and police interview, Plaintiff contends that Defendant Gurrola remained in position where he had downward pressure and body weight on Mr. Madrid's back until he was hobbled. Doc. 61, Ex. H, 36-37; Doc. 61, Ex. O , 3-6.

Defendants contend that even after the hobble was connected

to Mr. Madrid's handcuffs, Mr. Madrid continued to roll and attempted to kick his feet against the slack in the hobble, which caused his knees and thighs to come up off the ground, and to physically resist the officers' efforts to restrain him. Plaintiff contends that the hobble as originally applied was too tight, causing Mr. Madrid's thighs to come off the ground. As the hobble was applied, Mr. Madrid kicked, paused, then kicked again.

Defendants contend that once the hobble was applied, Defendants Valdez and Mendoza immediately rolled Mr. Madrid onto his side. Pointing to Defendant Valdez's deposition, Plaintiff contends that Defendant Valdez and Defendant Mendoza placed their knee in Mr. Madrid's lower back at a 45-degree angle from the ground to prevent Mr. Madrid from rolling once he was hobbled. Doc. 61, Ex. J, 21. Plaintiff also contends that once the hobble was applied, Mr. Madrid remained in prone position for 45 seconds until Officer Johnson insisted that he be turned to his side. Defendant Lewis used a pen or stick to clear Mr. Madrid's airway and used several strokes to clear all the dirt and debris inside Mr. Madrid's mouth.

Defendants contend that Officers Alvarado and Valdez removed the handcuffs from Mr. Madrid when they were applying the air bag to him. Plaintiff contends that the handcuffs were not removed from Mr. Madrid until the fire and emergency personnel took over the CPR efforts and insisted they be removed. Sergeant DeJong's

**17**

declaration states that Mr. Madrid was still handcuffed when

Officer Bailey was performing CPR on Mr. Madrid. Doc. 46-4, ¶ 29.

In his police interview, Captain Pilegard states that Mr. Madrid

was still handcuffed until "we asked to have the cuffs taken off

and PD did that right away." Doc. 61, Ex. V, 2. Firefighter Silva

also states that Mr. Madrid was handcuffed when he arrived, but

that the firemen asked police to remove Mr. Madrid's handcuffs.

*Id.* at 10.

     Defendants contend that the entire struggle with Mr. Madrid-

from the moment the officers first went to the ground and until

he was in handcuffs-lasted no more than 2 minutes. Plaintiff

contends that Defendant Mendoza testified that 2-3 minutes

elapsed from the time he arrived on the scene until the hobble

was applied to Mr. Madrid. Doc. 61, Ex. K, 42.

     Officer Defendants contend that they believed their actions

during the incident were reasonable and justified under the

circumstances and did not violate any clearly established law.

Mr. Madrid was running away from the officers, and was actively

resisting arrest even though the officers told him to stop.

Officer Defendants contend that they believed Mr. Madrid was a

threat to the other officers. When Mr. Madrid's arms were tucked

underneath his body, Officer Defendants contend that they feared

he might have a weapon. Officer Defendants contend that for the

safety of the officers and the safety of others, they used only

the type and amount of force that was necessary to arrest Mr. Madrid.

Defendant contends that Commander of Internal Affairs Bureau Lieutenant Dennis Montejano reviewed the police reports, witness and officer statements, plaintiff's complaint and the officers' declarations. Lieutenant Montejano concluded that under the circumstances reasonably perceived by Officer Defendants and other police officers present during the incident, the use of force and restraint employed by the officers upon Mr. Madrid was objectively reasonable and complied with the Fresno Police Department's policies, procedures, and training regarding the use of force and restraint of persons.

Plaintiff's expert, forensic pathologist Dr. Werner Spitz, made the following pertinent findings:

> The cause of death was certified following the autopsy as cardio-pulmonary arrest during restraint in a person under the influence of methamphetamine.

> Cardiopulmonary arrest is not a cause of death. Anyone who dies of whatever cause, be it, trauma or disease, eventually experiences cardiopulmonary arrest, which means that the heart has stopped beating and lungs have stopped breathing.

Doc. 61, Ex. X, 4.

> Drugs, including methamphetamine, had no bearing on the death of Pedro Madrid, except that it is drugs which brought Pedro Madrid to the attention of the police. If, for some unknown reason police had not responded and arrested Madrid, when they did, he would not have died.

> . . .

> The cause of death was not established at the autopsy.

*Id.* at 5.

**19**

> Pressure on the back interferes with normal breathing by compression of the rib cage. Additionally, pressure on the back pushes the abdominal organs up against the diaphragm. The organs cannot move downward because of the bone pelvis . . . Paralysis of the diaphragm stops breathing. Interference with normal gas exchange, i.e., with normal breathing, translates to reduced oxygenation of the blood which is the carrier of oxygen to the organs, thus reduced availability of oxygen to the brain, the heart and other organs. . . [w]hen the heart receives less oxygen than it needs, it goes into a haywire rhythm or stops beating all together.

*Id.* at 5-6.

> The process of dying in Pedro Madrid was initiated by the fact that lack of adequate amounts of oxygen from inability to breathe caused arrhythmia of the heart beat, followed by cardiac arrest. The records clearly indicate that Madrid's death was progressive, not instantaneous by any means. This was a death by asphyxiation, due to lack of oxygen availability.

*Id.* at 6.

> It would be conceivable that a person with advanced cardiovascular disease may collapse suddenly, during or soon following strenuous exercise or some other severe form of stressful or exciting event, such as fear of death. However, Pedro Madrid was in good physical health, whose autopsy revealed no significant findings to suggest abnormal compensatory mechanisms or reduced cardiovascular reserves.

*Id.* at 8.

### III. LEGAL STANDARD

Summary judgment is proper if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56.

The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those

1
2
3
4
5
6
7
8
9
10

portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986) (internal quotation marks omitted). A fact is material if it could affect the outcome of the suit under the governing substantive law; "irrelevant" or "unnecessary" factual disputes will not be counted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505 (1986).

11
12
13
14
15
16
17
18
19

If the moving party would bear the burden of proof on an issue at trial, it must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). In contrast, if the non-moving party bears the burden of proof on an issue, the moving party can prevail by "merely pointing out that there is an absence of evidence" to support the non-moving party's case. *Id.*

20
21
22
23
24
25
26

When the moving party meets its burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

27
28

In ruling on a motion for summary judgment, a court does not

make credibility determinations or weigh evidence. *See Anderson*, 477 U.S. at 255. Rather, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* Only admissible evidence may be considered in deciding a motion for summary judgment. Fed.R.Civ.P. 56(e). "Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment." *Soremekun*, 509 F.3d at 984.

## IV. DISCUSSION

### A. First Cause of Action: Section 1983 Claims Against Individual Officer Defendants

Section 1983 provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . ..

42 U.S.C. § 1983. "Section 1983 does not create any substantive rights, but is instead a vehicle by which plaintiffs can bring federal constitutional and statutory challenges to actions by state and local officials." *Anderson v. Warner*, 451 F.3d 1063, 1067 (9th Cir. 2006). To state a claim under 42 U.S.C. § 1983, a plaintiff must show (1) the violation of a right secured by the Constitution or a federal law, and (2) that the alleged deprivation was committed by a person acting under color of state

22

law. *West v. Atkins*, 487 U.S. 42, 48, 108 S.Ct. 2250 (1988).

Here, Plaintiff asserts claims against Officer Defendants for

violation of the Fourth Amendment and Fourteenth Amendment.

Defendants move for summary judgment on the Section 1983

claims against Officer Defendants on the ground that they are

entitled to qualified immunity. Qualified immunity shields

government officials "from liability for civil damages insofar as

their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have

known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727

(1982). The protection of qualified immunity applies regardless

of whether the government official makes an error that is "a

mistake of law, a mistake of fact, or a mistake based on mixed

questions of law and fact." *Pearson v. Callahan*, 555 U.S. 223,

129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009) (quoting *Groh v.*

*Ramirez*, 540 U.S. 551, 567, 124 S.Ct. 1284 (2004) (KENNEDY, J.,

dissenting)). The doctrine of qualified immunity protects "all

but the plainly incompetent or those who knowingly violate the

law ...." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092

(1986). Because qualified immunity is "an immunity from suit

rather than a mere defense to liability ... it is effectively

lost if a case is erroneously permitted to go to trial." *Mitchell*

*v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806 (1985) (emphasis

deleted).

The qualified immunity inquiry has two prongs: (1) "whether the facts that a plaintiff has alleged ... or shown ... make out a violation of a constitutional right," and (2) "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Wilkinson v. Torres*, 610 F.3d 546, 550 (9th Cir. 2010) (quoting *Pearson v. Callahan*, 129 S.Ct. at 815-816). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202, 121 S.Ct. 2151 (2001). This inquiry is wholly objective and is undertaken in light of the specific factual circumstances of the case. *Id*. at 201. "The principles of qualified immunity shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." *Pearson v. Callahan*, 129 S.Ct. at 823.

### 1. Fourth Amendment Claim

Excessive force claims are examined under the Fourth Amendment's prohibition against unreasonable seizures. *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865 (1989). Fourth Amendment analysis requires balancing of the quality and nature of the intrusion on an individual's interests against the countervailing governmental interests at stake. *Id*. at 396. Use of force violates an individual's constitutional rights under the

Fourth Amendment where the force used was objectively unreasonable in light of the facts and circumstances confronting them. *E.g., Id.* at 397. Excessive force inquiries require balancing of the amount of force applied against the need for that force under the circumstances. *Meredith v. Erath*, 342 F.3d 1057, 1061 (9th Cir.2003). "Because such balancing nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom . . . summary judgment or judgment as a matter of law . . . should be granted sparingly" in cases involving claims of excessive force. *Gregory v. Cnty. of Maui*, 523 F.3d 1103, 1106 (9th Cir. 2008) (quoting *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1056 (9th Cir. 2003).

> a. **Defendant Lewis**
>
> > i. **Constitutional Violation**

As Defendants Gurrola and Valdez secured Mr. Madrid face down on his stomach, Defendant Lewis: (1) pushed down on Mr. Madrid's back with his hand several times; (2) applied his TASER in contact or drive stun mode two to four times near Mr. Madrid's kidney, a degree of force the Ninth Circuit deems less than intermediate (*Brooks v. City of Seattle*, 599 F.3d 1018, 1027-1028 (9th Cir. 2010), *reh'g en banc granted*, 623 F.3d 911 (9th Cir. 2010); *Cf.*, *Bryan v. MacPherson*, ---F.3d---, 2010 WL 4925422, *2 (9th Cir. 2010) (holding that the use of a taser in dart-gun mode is an "intermediate, significant level of force which must be

justified by the government interest involved")); (3) jabbed his 12-15" long, 1" wide flashlight into Mr. Madrid's back two to three times near his kidney in the same area the TASER was applied; (4) struck Mr. Madrid with his flashlight in a downward motion three to four times in the same general area; and (5) punched Mr. Madrid in the face on his right cheek. The coroner's report found "blunt impact" to Mr. Madrid's head, trunk, and extremities and abrasions to Mr. Madrid's forehead, eyelid, chest and back, and legs. Doc. 61, Ex. W, 8. The quantum of force Defendant Lewis used must be balanced against the need for that force. *Meredith v. Erath*, 342 F.3d at 1061.

The government's interest in the use of force is evaluated by examining the three core factors of *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865 (1989): (1) the severity of the crime at issue, which is the most significant factor, *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994); (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Bryan v. MacPherson*, ---F.3d---, 2010 WL 4925422, *17 (9th Cir. 2010) (quoting *Graham*, 490 U.S. at 396). However, these factors are not exclusive; courts examine the totality of the circumstances and consider "whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*." *Bryan v. MacPherson*, 2010 WL 4925422 at *17

(quoting *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994).

Many factors weigh in favor of finding excessive force. Mr. Madrid's alleged crimes-being under the influence of a controlled substance, violating parole, and obstructing an officer in the exercise of his official duties-were neither violent nor severe. *See, e.g., Tatum v. City & Cnty. of S.F.*, 441 F.3d 1090, 1096 (9th Cir. 2006) (being under the influence of a controlled substance is not a severe crime); *Brooks*, 599 F.3d at 1028 (obstructing an officer in the exercise of official duties is not a serious crime). There is no evidence that Mr. Madrid advanced towards, attacked, or physically or verbally threatened or offered any force against any officer. Although Plaintiff had initially fled from the officers, when Defendant Lewis pushed down on Mr. Madrid's back, applied his TASER in contact-stun mode, pushed his flashlight into Plaintiff's back, struck Plaintiff with his flashlight, and punched Plaintiff in the face, Defendants Gurrola and Valdez had already pinned Plaintiff with their bodies, and the risk of flight was lessened. Defendant Lewis did not warn Mr. Madrid that if he did not comply with verbal orders, he would be tased, beaten, and punched. The Fresno Police Department's General Rules of Conduct regarding tasers state that "When practicable and safe to do so, commands and warnings should be given prior to using the EMDD [i.e., taser]." Doc. 46, Ex. B, ¶ 4.00. *See Bryan v. MacPherson*, 2010 WL 4925422 at *21 (finding

that an officer's failure to warn plaintiff that he would be shot with a taser if he did not comply with the order to remain in his car militates against finding the officer's use of force reasonable).

Several facts militate against a finding of excessive force. Although the officers successfully pulled Mr. Madrid onto the west embankment of Freeway 99, there was a risk that the officers and Mr. Madrid would be hit by oncoming traffic, that Mr. Madrid would break free and run onto the middle of the highway, or that the scuffle might cause a traffic accident. However, "[a] desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury. Rather, the objective facts must indicate that the subject poses an immediate threat to the officer or a member of the public." *Id.* at *17. Mr. Madrid was acting unusually and unpredictably; however, while "volatile, erratic conduct could lead an officer to be wary . . . this does not, by itself, justify the use of significant force." *Id.* The officers had identified themselves repeatedly to Mr. Madrid and repeatedly commanded him to stop.

There are two material facts in dispute. The parties dispute whether Officer Defendants reasonably believed that Mr. Madrid was concealing a weapon and therefore posed a threat to the officers' safety. It is undisputed that Mr. Madrid was unarmed;

however, the officer's actions must be examined "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*, at *3 (quoting *Graham*, 490 U.S. at 396). Defendant Officers contend that they feared Mr. Madrid was concealing a weapon under him because he refused to remove his arms. "A simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." *Id.* at *17 (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001)). Plaintiff contends that Mr. Madrid was unable to remove his arms from the sheer weight of the officers on top of him, and not because he was concealing a weapon. Plaintiff points to Defendant Gurrola's deposition, where Gurrola states that he was unable to remove his arm from under Mr. Madrid for this reason. Doc. 61, Ex. H, 36. In his police interview, Officer Alvarado states that he saw that Mr. Madrid did not have anything in his left hand. It was bunched up underneath Mr. Madrid, but he could see it exposed underneath his body and it was clinched up and empty. Doc. 61, Ex. R, 2. This fact is in dispute.

The parties also dispute whether Mr. Madrid actively resisted arrest. Defendants contend that during the incident, Mr. Madrid continued to struggle against the officers by locking his hands underneath his torso, refusing to obey commands to put his arms behind his back, flailing his body from side to side and up

and down in push-up like movements, and lifting his upper body completely away from the ground. Plaintiff contends that Mr. Madrid was unable to remove his arms due to the weight of the officers on top of him. Plaintiff points to Defendant Gurrola's deposition, where Defendant Gurrola states that he was unable to remove his arm from under Mr. Madrid for this reason. Doc. 61, Ex. H, 36. Plaintiff also contends that a fact finder could reasonably find Mr. Madrid's bodily movements to be consistent with someone thrashing about fighting for oxygen rather than resisting arrest. This fact is in dispute.

Whether Defendant Lewis' use of force was excessive under the totality of the circumstances is a difficult question. There are material factual disputes regarding whether the officers reasonably believed Mr. Madrid was armed and whether Mr. Madrid was resisting arrest. Where facts are disputed, their resolution and determinations of credibility are "manifestly in the province of a jury." *Wall v. Cnty. of Orange*, 364 F.3d 1107, 1110 (9th Cir. 2004) (quoting *Santos v. Gates*, 287 F.3d 846, 852 (9th Cir. 2002). Viewing the facts in the light most favorable to Plaintiff, a reasonable fact finder could find that Defendant Lewis' use of force was objectively unreasonable. The quantum of force Defendant Lewis used balanced against Mr. Madrid's non-violent, non-severe crimes; the fact that Mr. Madrid did not advance towards, attack, or physically or verbally threaten any Officer

Defendant; Defendant Lewis' failure to warn Mr. Madrid before exerting force; Mr. Madrid's minimal flight risk; the threat posed to officers and bystanders from being next to Freeway 99; the officers' repeated warnings to Mr. Madrid; the inference that Mr. Madrid was not armed; and the inference that Mr. Madrid was not resisting arrest, could lead a reasonable fact finder to find Defendant Lewis' use of force excessive. This factual dispute is enhanced by the circumstance that Mr. Madrid was immobilized on his stomach when Defendant Lewis applied these different types of force (his TASER, flashlight strikes, and fist), and whether any of this force was needed with two other officers already on Mr. Madrid.

ii. **Qualified Immunity**

Assuming that Defendant Lewis violated Mr. Madrid's Fourth Amendment rights, the next inquiry is whether the right was "clearly established" on the date of the incident. *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 814 (2009). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202, 121 S.Ct. 2151 (2001). "Even where there is no federal case analyzing a similar set of facts, a plaintiff may nonetheless demonstrate that a reasonable officer would have known that the force he used was excessive." *Davis v.*

31

*City of Las Vegas*, 478 F.3d 1048, 1056 (9th Cir. 2007).

In *Bryan v. MacPherson*, ---F.3d---, 2010 WL 4925422, *23 (9th Cir. 2010), the Ninth Circuit held that the use of a taser and similar devices in dart mode constitutes an "intermediate, significant level of force that must be justified by the governmental interest involved" and that such law is clearly established. However, the Ninth Circuit held that the law regarding tasers was not clearly established in 2005 when the incident in question occurred. *Id.* The Ninth Circuit also noted that two recent Ninth Circuit panels concluded that the law regarding tasers is not sufficiently clearly established to warrant denying officers qualified immunity. *Id.* (citing *Mattos v. Agarano*, 590 F.3d 1082, 1089-90 (9th Cir. 2010)*, reh'g en banc granted*, 625 F.3d 1132 (9th Cir. 2010), and *Brooks v. City of Seattle*, 599 F.3d 1018, 1031 n.18 (9th Cir. 2010))*, reh'g en banc granted*, 623 F.3d 911 (9th Cir. 2010)). Under *Bryan v. MacPherson*, Defendant Lewis would be entitled to qualified immunity for implementing the TASER on Mr. Madrid.

However, in this case, Defendant Lewis used force more than tasing alone. Defendant Gurrola, who weighs approximately 165 pounds, and Defendant Valdez, who weighs approximately 160 pounds, were pressing down on Mr. Madrid's shoulders, back, and torso, with Mr. Madrid's stomach pressed into the ground as Defendant Lewis applied force to Mr. Madrid with his flashlight

1   and fist.

2       In *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d

3   1052, 1056 (9th Cir. 2003), the Ninth Circuit held that two

4   officers who "continued to press their weight into [an

5   individual's] neck and torso as he lay handcuffed on the ground

6   and begged for air" was excessive force. "Under similar

7   circumstances, in what has come to be known as 'compression

8   asphyxia,' prone and handcuffed individuals in an agitated state

9   have suffocated under the weight of restraining officers." *Id.*

10  Officers are trained to recognize this risk. The Ninth Circuit

11  concluded that the officers were not entitled to qualified

12  immunity, as any reasonable officer would have known that such

13  conduct constituted excessive force; moreover, the police

14  department's training materials gave the officers fair notice of

15  the dangers of restraint asphyxia. *Id*. at 1061-1062.

16      The Fresno Police Department's training materials state that

17  the taser "should not be used on a restrained subject, unless the

18  actions of the subject present an immediate threat of physical

19  injury to a department member, the restrained subject, or another

20  person." Doc. 46, Ex. B, ¶ 4.00. The Fresno Police Department's

21  training materials also warn about the dangers of positional

22  asphyxia. *See* Doc. 46, Ex. H, 3. According to the report of

23  forensic pathologist Dr. Werner Spitz:

24          The process of dying in Pedro Madrid was initiated by the
            fact that lack of adequate amounts of oxygen from inability

**33**

to breathe caused arrhythmia of the heart beat, followed by
cardiac arrest. The records clearly indicate that Madrid's
death was progressive, not instantaneous by any means. This
was a death by asphyxiation, due to lack of oxygen
availability.

Doc. 61, Ex. X, 6.

If accepted by a trier of fact, the degree of restraint

impeding Mr. Madrid's breathing was the cause of fact. A

reasonable officer would have known that Defendants Gurrola and

Valdez's positioning and pressure on Mr. Madrid's back and neck

posed a danger of compression asphyxia. *See Bryan v. MacPherson*,

2010 WL 4925422 at *23. Despite this danger to Mr. Madrid of

compression asphyxia apparent from Mr. Madrid's position under

the officers, Defendant Lewis proceeded to tase Mr. Madrid two to

four times, push his flashlight into Mr. Madrid's kidney area,

beat Mr. Madrid with his flashlight, and punch him in the face.

The Fresno County Coroner's Report found numerous wounds to Mr.

Madrid's body providing physical evidence of the degree of force

applied to him:

    I.   Blunt impact to the head with
         a. Abrasions to the left side of the forehead.
         b. Abrasions to the left upper eyelid.
    II.  Blunt impact to the trunk with
         a. Three pairs of patterned abrasions to the right side
            fron t of chest as well as to the right side of the
            back.
         b. Multiple abrasions to the back.
    III. Blunt impact to the extremities with
         a. Multiple abrasions to the back of the left elbow and
            left wrist.
         b. Abrasions to the back of the right elbow.
         c. Multiple abrasions on the outer aspect of the right
            knee as well as the front of the left knee.

**34**

      d. Multiple abrasions to the front of the right leg.
          All the abrasions show partial healing.

Doc. 61, Ex. W, 8. There are disputes of material facts about the reasonableness of Defendant Lewis' force which preclude summary judgment. *Wall v. Cnty. of Orange*, 364 F.3d at 1110. Viewing the facts in the light most favorable to Plaintiff, a reasonable fact finder could find that a reasonable officer would have known that all the force used by Defendant Lewis was unnecessary and excessive.

Defendants' motion for summary on the Fourth Amendment claim against Defendant Lewis on the grounds of qualified immunity is DENIED.

**b. Defendants Gurrola, Valdez, and Mendoza**

**i. Constitutional Violation**

Defendants Gurrola, Valdez, and Mendoza collectively applied weight to Mr. Madrid's torso, back, and sides as he lay face down on the ground on his stomach. Mr. Madrid weighed 184 pounds; Defendant Gurrola weighed approximately 165 pounds; Defendant Valdez weighed approximately 160 pounds; and Defendant Mendoza weighed approximately 175 pounds. The weight of the three officers totaled 400 pounds.

There is a factual dispute regarding the amount of weight and pressure the officers put on Mr. Madrid. Defendants contend that the officers did not put any weight on Mr. Madrid. However, in his police interview, Defendant Gurrola testified that he was

on top of Mr. Madrid, holding on to him until he was handcuffed:

"I stayed on him. I held onto him, stayed on the ground with him.

I wouldn't let him up until we were able to get his arms out."

Doc. 61, Ex. O, 5. Defendant Gurrola also states that he

attempted to put a carotid hold on Mr. Madrid but was unable to

do so, and that his biceps ended up underneath Mr. Madrid's

throat under his chin, then across Mr. Madrid's chest. *Id.* at 3-

4. In his deposition, Defendant Gurrola states that he used his

body weight to apply downward pressure and push on Mr. Madrid's

back and left shoulder area. Doc. 61, Ex. H, 25-26. In his

deposition, Defendant Mendoza states that he applied a modified

arm bar on Mr. Madrid's body. Doc. 61, Ex. K, 25. In his police

interview January 9, 2007, Defendant Valdez stated that he did

not put all his weight on Mr. Madrid, but that he was on his

knees and leaning on top of Mr. Madrid. Doc. 61, Ex. P, 2. In

deposition, Defendant Valdez stated that his knee was on Mr.

Madrid's waist. Doc. 61, Ex. J, 16. Defendant Valdez also stated

that once the hobble was applied, Defendant Valdez and Defendant

Mendoza had their shins at approximately 45-degree angles from

the ground, keeping Mr. Madrid from toppling over. *Id.* at 21. The

amount of force Defendants Gurrola, Mendoza, and Valdez used must

be viewed in light of the risk of positional asphyxia. *See*

*Drummond ex rel Drummond,* 343 F.3d at 1056 (holding that two

officers who "continued to press their weight into [an

individual's] neck and torso as he lay handcuffed on the ground and begged for air" was "severe and, under the circumstances, capable of causing death or serious injury").

The quantum of force used by Defendants Gurrola, Valdez, and Mendoza must be balanced against the need for that force under all the circumstances. *Meredith v. Erath*, 342 F.3d at 1061. Mr. Madrid's alleged crimes were not serious. Mr. Madrid did not advance towards, attack, or physically or verbally threaten any defendant or other officer. He was uncooperative and resistive. After Officer Defendants secured Mr. Madrid, his risk of flight became minimal and the need for force diminished. The incident occurred along the embankment of Freeway 99, raising danger to the officers, Mr. Madrid, and bystanders. There are additional material factual disputes as to whether Officer Defendants reasonably believed Mr. Madrid was armed and whether he was resisting arrest. There is also a factual dispute regarding the amount of weight and pressure Defendants Gurrola, Valdez, and Mendoza put on Mr. Madrid. Viewing all the facts in favor of Plaintiff, under the totality of the circumstances a reasonable person could find that Defendants Gurrola, Valdez, and Mendoza's use of force was excessive.

ii. **Qualified Immunity**

Assuming that Defendants Gurrola, Valdez, and Mendoza violated Mr. Madrid's Fourth Amendment rights, the next inquiry

37

is whether the right was "clearly established" on the date of the incident. *Pearson v. Callahan*, 129 S.Ct. at 814. Under *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, Defendants Gurrola, Valdez, and Mendoza had fair warning of positional asphyxia and that the force they used on Mr. Madrid could be unconstitutionally excessive. The Fresno Police Department's training materials on positional asphyxia warn of the risk of positional asphyxia during violent arrests where the subject is face down on the stomach. Doc. 46, Ex. H at 3; *see Drummond ex rel. Drummond,* 343 F.3d at 1062 (a police department's "training materials are relevant not only to whether the force employed in this case was objectively unreasonable . . . but also to whether reasonable officers would have been on *notice* that the force employed was objectively unreasonable").

Defendants' motion for summary judgment on the Fourth Amendment claim against Defendants Gurrola, Valdez, and Mendoza on the grounds of qualified immunity is DENIED.

### c. **Defendant Bell**

#### i. **Constitutional Violation**

While Mr. Madrid was face down on the ground with Defendants Gurrola, Valdez, and Mendoza restraining him, Defendant Bell held Mr. Madrid's legs down, applied the hobble restraint on Mr. Madrid's legs, and attached the hobble to Mr. Madrid's handcuffs. In deposition, Defendant Mendoza stated: "I saw right away that

**38**

it was too tight . . . Mr. Madrid's legs seemed to be, seemed to be way up toward the small of his back. I loosened it right away, as far as trying to have the body relax. . .[The hobble] [s]eemed to be just too pulled too tight, as far as the length of the rope." Doc. 61, Ex. K, 31. According to Sergeant DeJong's declaration, Defendant Bell loosened the hobble after Sergeant DeJong instructed him to do so. Doc. 46-4, ¶ 21.

Mr. Madrid's alleged crimes were neither violent nor serious. Mr. Madrid did not advance, advance towards, attack, or physically or verbally threaten any Officer Defendant. After Mr. Madrid was handcuffed, his flight risk was minimal. However, the incident occurred along the embankment of Freeway 99, raising the risk of danger to the officers, Mr. Madrid, and bystanders. There are material factual disputes as to whether Officer Defendants reasonably believed Mr. Madrid was armed and whether he was resisting arrest. As there is a factual dispute regarding whether Mr. Madrid was actually resisting arrest thereby justifying the hobble, summary judgment is not appropriate. Viewing the facts in the light most favorable to Plaintiff, i.e., that Mr. Madrid was writhing for oxygen, a reasonable fact finder could find that Defendant Bell's use of force was excessive.

### ii. Qualified Immunity

Assuming that Defendant Bell violated Mr. Madrid's Fourth Amendment rights, the next inquiry is whether the right was

"clearly established" on the date of the incident. *Pearson v. Callahan*, 129 S.Ct. at 814.

The Ninth Circuit has stated that it "in some situations, the need to maintain control of a person who physically struggled while being taken into custody might reasonably call for the use of hobble restraints." *Blankenhorn v. City of Orange*, 485 F.3d 463, 479 (9th Cir. 2007). However, *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052 (9th Cir. 2003), gave Defendant Bell fair warning of the risk of positional asphyxia. In *Drummond,* the Ninth Circuit reversed the district court's grant of summary judgment in favor of police officers who had leaned on an individual's upper neck and torso, then bound his ankles in a hobble restraint. *Id.* at 1054-1055.

The Fresno Police Department's training materials also gave Defendant Bell warning of the risk of positional asphyxia, particularly with a hobble. The City of Fresno Police Department's standing orders on arrest procedures state the following regarding hobble restraints:

> Arrestees who are restrained with the Hobble should not be placed on their stomachs or in any position where a part of the vehicle) drive shaft hump, edge of rear seat, etc.) can hinder breathing. Officers should constantly monitor the arrestee's condition to ensure that normal respiration is maintained. When practical, and safe to do so, the Hobble should be removed to reduce the risk of injury to the suspect.

Doc. 46, Ex. E, ¶ 1.04. The City of Fresno Police Department's roll call training bulletin on positional asphyxia warns:

**40**

> In conclusion, officers who arrest a violent, combative person must protect themselves from further attack or possible injury. Using a hobble to restrain a subject's legs can cause an unintended physical reaction.

Doc. 46, Ex. H, 3. A police department's training materials are "relevant not only to whether the force employed was objectively unreasonable . . . but also to whether reasonable officers would have been on notice that the force employed was objectively unreasonable." *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1062 (9th Cir. 2003).

Defendants' motion for summary on the Fourth Amendment claim against Defendant Bell on the grounds of qualified immunity is DENIED.

## 2. **Fourteenth Amendment Claim**

### a. **Constitutional Violation**

The Ninth Circuit recognizes that a "child's interest in her relationship with a parent is sufficiently weighty by itself to constitute a cognizable liberty interest." *Curnow By & Through Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991) (quoting *Smith v. City of Fontana*, 818 F.2d 1411, 1419 (9th Cir. 1987), *cert. denied*, 484 U.S. 935, 108 S.Ct. 311 (1987)). Official conduct that "shocks the conscience" in depriving a child of such interest is cognizable as a due process violation. *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008). In determining whether excessive force shocks the conscience, the first inquiry is "whether the circumstances are such that actual

41

deliberation by the officer is practical." *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010) (quoting *Porter v. Osborn*, 546 F.3d at 1137) (internal brackets omitted). Where actual deliberation is practical, an officer's "deliberate indifference" may suffice to shock the conscience. *Id.* However, if an officer "makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." *Id.* In *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008), the Ninth Circuit found that actual deliberation was not practical for an officer faced with an evolving set of circumstances over five minutes necessitating "fast action" and "repeated split-second decisions." *Id.* at 1139.

Applying this standard, no evidence shows that Officer Defendants had a purpose to harm Mr. Madrid apart from their law enforcement objectives, unless speculation is indulged to infer Officer Defendants were angry or vindictive. The incident occurred alongside Freeway 99, and required fast action and split-second decisions. There is no evidence to support Plaintiff's Fourteenth Amendment claim.

**b. Qualified Immunity**

There is no evidence to support Plaintiff's Fourteenth Amendment claim. Officer Defendants did not violate Mr. Madrid's Fourteenth Amendment rights and are entitled to qualified

immunity on Plaintiff's Fourteenth Amendment claim.

Defendants' motion for summary judgment on the Fourteenth Amendment claim in the first cause of action is GRANTED.

## B. Section 1983 Claims Against Chief of Police Jerry Dyer and City of Fresno

### 1. Second Cause of Action: Supervisory Liability

In a section 1983 action, there is no vicarious "supervisory liability," because "[e]ach Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Ashcroft v. Iqbal*, --- U.S. ---, 129 S.Ct. 1937, 1949 (2009). A supervisor may be individually liable under Section 1983 "if there exists either: (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Jeffers v. Gomez*, 267 F.3d 895, 915 (9th Cir. 2001) (quoting *Redman v. Cnty. of San Diego*, 942 F.2d 1435, 1446 (9th Cir. 1991)).

Defendants contend that in the absence of an underlying Constitutional violation, there can be no supervisory liability. There is a genuine issue of material fact whether Officer Defendants violated Mr. Madrid's civil rights. However, Plaintiff has not provided any evidence that Defendant Dyer or Defendant City had any personal involvement in or knowledge of the incident or that there was a causal connection between any actions of Defendant Dyer or Defendant City and the constitutional

**43**

violation.

Defendants' motion on summary judgment as to Plaintiff's second cause of action is GRANTED.

2. **Third Cause of Action: *Monell* Liability**

A municipality may be held liable under Section 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell v. Dep't of Soc. Servs.*, 463 U.S. 658, 694, 98 S.Ct. 2018 (1978). To prevail under a Section 1983 claim against a local government, a plaintiff must show that (1) he or she was deprived of a constitutional right, (2) the local government had a policy, (3) the policy amounted to a deliberate indifference to his or her constitutional right, and (4) the policy was the moving force behind the constitutional violation. *Burke v. Cnty. of Alameda*, 586 F.3d 725, 734 (9th Cir. 2009). There are three ways to show a municipality's policy or custom:

> (1) by showing "a longstanding practice or custom which constitutes the 'standard operating procedure' of the local government entity;" (2) "by showing that the decision-making official was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision;" or (3) "by showing that an official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate.

*Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005)(quoting *Ulrich v. City & Cnty. of S.F.*, 308 F.3d 968, 984-

44

85 (9th Cir. 2002)). The Ninth Circuit has held that a municipal policy "may be inferred from widespread practices or evidence of repeated constitutional violations for which the errant municipal officers were not discharged or reprimanded." *Menotti,* 409 F.3d at 1147 (quoting *Nadell v. Las Vegas Metro. Police Dep't*, 268 F.3d 924, 929 (9th Cir. 2001)). Here, Plaintiff has no evidence of any policy or other similar incidents.

In certain circumstances, failure to train may serve as a basis for Section 1983 liability where the failure to train amounts to "deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197 (1989). *Monell* is not satisfied by only alleging that the existing training program represents a policy for which the city is responsible. *Id.* at 389. Rather, the focus must be on whether the training program is adequate in relation to the tasks the particular officers must perform, and if it is not, on whether such inadequate police training can justifiably be said to represent "city policy." *Id.* at 390. Only where the failure to train reflects a municipality's "deliberate" or "conscious" choice can the failure be an actionable city "policy or custom." *Id.* at 389. Moreover, the identified deficiencies in a city's training program must be closely related to the ultimate injury. *Id.* at 391.

Plaintiff contends that Defendant City failed to adequately

train its officers on how to properly detain suspects and not

subject them to positional asphyxiation. However, in the

opposition to summary judgment, Plaintiff states that "all the

officers involved in the melee had been educated on the causes

and effects of positional asphyxia . . .." Doc. 58, 29:10-11. It

is undisputed that the City of Fresno Police Department has

policies and procedures regarding: (1) use of force re: TASER

electronic control devices; (2) issued optional equipment; (3)

subjects under the influence of drugs; (4) restraint procedures;

(5) handling and evaluation of mentally ill persons; (6) training

regarding positional asphyxia and the handling of Section 5150

subjects; and (7) training regarding the reasonable use of force

regarding electronic weapons such as a TASER. It is undisputed

that Defendant Officers all received training in accordance with

Fresno Police policies. Plaintiff has not criticized the

policies, offered any evidence to show how Defendant City's

policies and procedures were deficient or amount to deliberate

indifference to Mr. Madrid's constitutional rights, or that

Defendant City failed to adequately train Officer Defendants.

Plaintiff also argues, without evidence, that Defendant City

does not admonish officers who do not follow departmental

policies regarding the use of force. Plaintiff cites *Henry v.*

*Cnty. of Shasta*, 132 F.3d 512, 519 (9th Cir. 1997), *amended by* 137

F.3d 1372 (9th Cir. 1998), for its holding that when a

**46**

municipality "turn[s] a blind eye to severe violations of inmates' constitutional rights-despite having received notice of such violations-a rational fact finder may properly infer the existence of a previous policy or custom of deliberate indifference." However, Plaintiff has not offered any evidence of similar past violations by the Fresno police department, nor any evidence that Defendant City received notice of similar violations, or any evidence that Defendant City had a policy or custom of deliberate indifference. There are no material issues of fact concerning Defendant City's *Monell* liability.

Defendants' motion on summary judgment as to Plaintiff's third cause of action is GRANTED.

**C. State Law Claims**

**1. Immunity under California Government Code §§ 820.2 and 820.4**

Defendants contend that they are immune from Plaintiff's state law claims (causes of action four through eight) on grounds of immunity under California Government Code Sections 820.2 and 820.4. California Government Code Section 820.2 provides:

> Except as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused.

Cal. Gov't Code § 820.2. California Government Code Section 820.4 provides:

> A public employee is not liable for his act or omission, exercising due care, in the execution or enforcement of any

**47**

law. Nothing in this section exonerates a public employee
from liability for false arrest or false imprisonment.

Cal. Gov. Code § 820.4.

Plaintiff's state law claims arise from allegations that Officer Defendants exerted excessive force against Mr. Madrid. "California denies immunity to police officers who use excessive force in arresting a suspect." *Robinson v. Solano Cnty.*, 278 F.3d 1007, 1016 (9th Cir. 2002) (denying qualified immunity to county and police officers from detainee's claims for assault, battery, negligence and gross negligence arising from alleged use of excessive force). For the reasons discussed, there are material questions of fact whether Officer Defendants exerted excessive force on Mr. Madrid.

California has not adopted *Monell* and imposes liability on counties under the doctrine of respondeat superior for acts of county employees; it grants immunity to counties only where the public employee would also have immunity. *Id.;* Cal. Gov't Code § 815.2[1]. As Officer Defendants are not granted immunity from suit on Plaintiff's state law claims, Defendant City remains a Defendant on state law claims. There is no evidence against Chief

---

[1] California Government Code § 815.2 provides:

(a) A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative.
(b) Except as otherwise provided by statute, a public entity is not liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability.

Dyer sued in his official capacity.

Defendants' motion for summary judgment of Plaintiff's state law claims on the grounds of immunity is DENIED.

   2. **Fourth Cause of Action: Assault, Battery; Seventh Cause of Action: Negligence-Wrongful Death**

Plaintiff's claims for assault, battery, and negligence-wrongful death flow from the same facts as the alleged Fourth Amendment violation for excessive force and are measured by the same reasonableness standard of the Fourth Amendment. *See Edson v. City of Anaheim*, 63 Cal.App.4th 1269, 1272-73, 74 Cal.Rptr.2d 614 (1998); *Munoz v. City of Union City*, 120 Cal.App.4th 1077, 1102 n.6, 16 Cal.Rptr.3d 521 (2004). There are material factual disputes regarding the reasonableness of Officer Defendants' actions. Accepting Plaintiff's version of the facts as true, Officer Defendants are not entitled to summary judgment on Plaintiff's state law claims for assault, battery, and negligence.

Defendants' motion on summary judgment as to Officer Defendants is DENIED.

   3. **Fifth Cause of Action: The Unruh Civil Rights Act (California Civil Code § 51.7)**

The Unruh Civil Rights Act provides in pertinent part:

All persons within the jurisdiction of this state have the right to be free from any violence, or intimidation by threat of violence, committed against their persons or property because of political affiliation, or on account of any characteristic listed or defined in subdivision (b) or (e) of Section 51, . . . or because another person perceives

**49**

them to have one or more of those characteristics.

Cal. Civ. Code § 51.7(a). Characteristics listed in Sections 51 (b) and (e) are: sex, race, color, religion, ancestry, national origin, disability, medical condition, marital status, and sexual orientation. *Id.* at § 51.7(b), (e). Plaintiff contends that Mr. Madrid is readily identifiable as an Hispanic male, and Officer Defendants' actions are so outrageous and incongruous to the situation encountered that it must have been motivated by racial animus. This is nothing but conjecture and ignores that several of the Officer Defendants are also Hispanic. Plaintiff has no evidence that any Officer Defendant's actions were motivated by Mr. Madrid's race, color or any other protected class animus.

Defendants' motion for summary judgment on the fifth cause of action is GRANTED.

**4. <u>Sixth Cause of Action: The Bane Civil Rights Act (California Civil Code § 52.1)</u>**

The Bane Act establishes a private right of action against a person who "interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state." Cal. Civ. Code § 52.1(a). Elements of an excessive force claim under the Bane Civil Rights Act are essentially identical to those of a Section 1983 excessive force claim. *Knapps v. City*

*of Oakland*, 647 F.Supp.2d 1129, 1168 (N.D. Cal. 2009). Accepting Plaintiff's version of the facts as true, a rational jury could conclude that Officer Defendants used excessive force on Mr. Madrid.

Defendants' motion for summary judgment on the sixth cause of action is DENIED.

### 5. **Eighth Cause of Action: Negligent Hiring, Retention, Training, Supervision, and Discipline**

Defendants move for summary judgment on Plaintiff's claim for negligent hiring, retention, training, supervision and discipline against Defendant Dyer and Defendant City. Defendants contend that pursuant to California Government Code § 815(a), "[e]xcept as otherwise provided by statute: (a) A public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee of any other person." Cal. Gov't Code § 815(a). Defendants contend that since the exclusive basis for a public entity's liability is statutory, causes of action based on negligence cannot be maintained.

A subsequent section of the California Government Code contravenes Defendant's overbroad statement that government entities cannot be liable for causes of action based on negligence. California Government Code § 815.2(a) provides that "[a] public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the

scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative." Cal. Gov't Code § 815.2(a). Under this provision, the Ninth Circuit held that a county was not immune from suit for several state law claims, including negligence and gross negligence, based on its employee officers' use of excessive force. *Robinson v. Solano Cnty.*, 278 F.3d 1007, 1016 (9th Cir. 2002).

Even if Defendant City is not immune from suit, Plaintiff has offered no evidence to support a claim for negligent hiring, retention, training, supervision or discipline.

Defendants' motion for summary judgment on the eighth cause of action is GRANTED.

D. **Defendants' Objection and Motion to Strike**

Defendant moves to strike the Declaration of Ben Nisenbaum and supporting exhibits filed January 25, 2011, one day late. Defendant objects to Plaintiff's opposition, which was filed on January 24, 2011 on 10:29 p.m., after the close of business on the due date. In the absence of a showing that Plaintiff's late filing prejudiced Defendants, it is unnecessary to exercise discretion to strike Plaintiff's opposition, Mr. Nisenbaum's declaration, and exhibits supporting Plaintiff's opposition.

Defendants object to Plaintiff's 29-page opposition brief, which surpasses the 25-page limit for legal brief or memoranda in

52

civil cases. Defendants contend that they are limited to a 10-page reply brief and are therefore prejudiced by Plaintiff's overlong opposition. Plaintiff's counsel shall comply with local rules, including page limits for legal brief and memoranda at all times.

Defendant's motions to strike are DENIED.

### V. CONCLUSION

For the reasons stated:

1. Defendants' motion for summary judgment is GRANTED in part and DENIED in part, as follows:

    a. Defendant's motion for summary judgment on the first cause of action is DENIED as to Plaintiff's Fourth Amendment claim and GRANTED as to Plaintiff's Fourteenth Amendment claim.

    b. Defendant's motion for summary judgment on the second cause of action is GRANTED.

    c. Defendant's motion for summary judgment on the third cause of action is GRANTED.

    d. Defendant's motion for summary judgment on the fourth cause of action is DENIED.

    e. Defendant's motion for summary judgment on the fifth cause of action is GRANTED.

    f. Defendant's motion for summary judgment on the sixth cause of action is DENIED.

g. Defendant's motion for summary judgment on the seventh cause of action is DENIED.

h. Defendant's motion for summary judgment on the eighth cause of action is GRANTED.

2. Defendant's motions to strike are DENIED.

3. Plaintiff shall submit a proposed form of order consistent with this memorandum decision within five (5) days of electronic service of this memorandum decision.

**SO ORDERED.**

**DATED: February 23, 2011.**

                                   **/s/ Oliver W. Wanger**
                                    **Oliver W. Wanger**
                            **United States District Judge**